## Milford Township v. DiDomenico

*William Thatcher,* for plaintiff.
*Norman A. Klinger,* for defendants.

MIMS, *J.,* February 27, 1981—This matter is before the court on appeal from the judgment of a district justice and in the form of an action in mandamus. Nicholas, Margaret and Louis DiDomenico were convicted of violating Milford Township Ordinances nos. six and 26. From this conviction, they filed both civil and criminal appeals. Concurrently, Nicholas and Margaret DiDomenico filed a complaint in mandamus against the Board of Supervisors of Milford Township and Clarence H. Huber, the township's Junk Yard Inspector, to compel the issuance of a junkyard license. By stipulation approved by the court, all parties agreed that the appeal from the decision of the district justice would proceed as a civil case and that the appeal and the mandamus action would be consolidated.

Hearings de novo have been held. Briefs have been filed and the matter is now ready for disposition.

Nicholas and Margaret DiDomenico purchased land in the Finland area of Milford Township in 1968 and thereafter began operating a junkyard business on the property. At that time, there was in effect an ordinance requiring a license for, and regulating the operation of, junkyards in the township. The following year and again in 1975, the township enacted zoning ordinances which would prohibit the DiDomenicos' operation unless they

had established a nonconforming use. The matter is complicated by the DiDomenicos' failure to comply with the Junk Yard Ordinance. They have been convicted by the district justice of violating both the junkyard and zoning ordinances.

The issues to be determined are:

1. Is the DiDomenicos' junkyard a valid nonconforming use and thus exempted from the provision of Milford Township's zoning ordinance?

2. If so, was the use abandoned making its reestablishment a violation of the zoning ordinance?

3. Did the DiDomenicos violate the Junk Yard Ordinance?

4. Should the township's officials be compelled in mandamus to issue a junkyard license to the DiDomenicos?

We make the following

## FINDINGS OF FACT

1. Nicholas DiDomenico and Margaret Di-Domenico are adult individuals who reside at 204 Gravel Pike, Rahns, Montgomery County, Pa.

2. Louis DiDomenico, their son, is an adult individual who resides at 17 Cheyenne Road, Royersford, Montgomery County, Pa.

3. Clarence H. Huber is the Zoning Officer and Junk Yard Inspector of Milford Township, Bucks County, Pa.

4. The Township of Milford is a second class township, a municipality of Bucks County, Pa., with offices located at Old Route 663, P.O. Box 86, Spinnerstown, Pa. 18968.

5. The Board of Supervisors of Milford Township is the duly elected governing body of Milford Township, Bucks County.

6. Nicholas and Margaret DiDomenico are the owners of premises located on Upper Ridge Road, L.R. 09101, approximately 410 feet east of its intersection with Swamp Creek Road, in an area known as Finland, Milford Township, Bucks County, Pa., being Bucks County Tax Mapping Parcel Number 23-20-30.

7. From and after October 19, 1963 there was in effect in Milford Township, Bucks County, Pa., ordinance no. 6 entitled "An Ordinance Prohibiting the Operation of Unlicensed Junk Yards, Providing Regulations For the Maintenance and Operation of Junk Yards, Providing for Inspections and the Appointment of an Inspector, Permitting the Supervisors to Adopt Regulations, Prescribing Penalties for Violations, and Providing for Enforcement."

8. On June 10, 1969 the Zoning Ordinance of 1969 of Milford Township, effective June 20, 1969, was enacted permitting only junkyards which complied with the Junk Yard Ordinance.

9. In July, 1975 the present zoning ordinance, ordinance no. 26 entitled "Milford Township Portion of the Quakertown Area Zoning Ordinance," became effective.

10. The said ordinance placed the DiDomenicos' Milford Township property in an RP (Resource Protection) district in which the operation of a junkyard is prohibited.

11. Nicholas and Margaret DiDomenico signed an agreement of sale for their Milford Township property on April 26, 1968 and obtained title by a deed dated August 26, 1968.

12. At the time of the purchase the property consisted of over four acres of land with a barn. The lot was largely covered with brush, trees and boulders, the rear portion being heavily wooded.

13. The prior owners left three 55 gallon drums of metal tags suitable for salvage in the barn when they sold the property.

14. Immediately after the DiDomenicos signed the agreement of sale in April of 1968, they began using the property for the storage and salvage of junk.

15. During this time, they brought onto the property numerous drums of battery acid lead, junked cars and and an old Coke machine.

16. Between May, 1968 and June, 1969 the Di-Domenicos were twice ordered to clean up the junk on their property and were subsequently convicted by a district justice in 1969 of violating the Junk Yard Ordinance.

17. During 1968 and 1969 Nicholas DiDomenico with the help of his son, Louis, operated a junkyard business on the Milford property. Among other activities, they bought, dismantled and salvaged drums of battery acid lead and stored there from four to twenty junked cars. Their hours were irregular, primarily evenings and weekends. They also employed in their business at least one part-time worker, Charles Powell.

18. After their conviction in 1969 the Di-Domenicos disposed of some of the offending junk, put up a fence, moved some of their materials to the rear heavily wooded portion of the property and generally tried to make their operation more presentable. However, they never ceased operating and at least two cars, along with lumber and ten to fifteen 55 gallon drums remained on the property until 1976.

19. In 1974 in the hope of selling their property, the DiDomenicos again cleaned it up. However, a sale never occurred.

20. After 1971, when Louis DiDomenico

graduated from high school, he took a more active part in his father's business and in 1976 the volume of the DiDomenicos' operation increased significantly. In that year they excavated a portion of the rear of their property to accommodate additional junk.

21. From June through October, 1976 scrap and salvage material including junked cars, steel, wire, fencing and tires were brought onto the property every few days until by October there were present anywhere from 30 to 45 cars.

22. Since its inception the nature of the DiDomenicos' operation has been cyclical with various activities taking place at various times and with scrap and salvage items continuously being bought and sold.

23. Up to the time of the hearing, the DiDomenicos have continued to operate a junkyard in the same manner on their Milford property.

24. In August, 1968, prior to making settlement on their property, Nicholas DiDomenico accompanied by his wife and his son, Louis, went to the Milford Township office and spoke to the Junk Yard Inspector, Henry Klausfelder, to apply for a junkyard license. Mr. Klausfelder told them that none were available.

25. A year later, shortly after the 1969 Zoning Ordinance became effective in Milford, Nicholas DiDomenico again spoke to Mr. Klausfelder regarding a junkyard license and again he was refused.

26. On December 3, 1969 the DiDomenicos' prior attorney wrote a letter to the Secretary of the Board of Milford Township requesting an application for a junkyard license. On December 8, 1969 Mr. Klausfelder, responding by letter, refused this request.

27 As his reason, Mr. Klausfelder stated that

Nicholas DiDomenico had not "established prior rights" for a junkyard, although he "did indeed, store some junked cars on this property prior to the passage of . . . [the] Zoning Ordinance."

28. At no time since the DiDomenicos purchased the Milford property have they had a junkyard license pursuant to Milford Township Ordinance no. 6.

## DISCUSSION

### Appeal From the Decision of the District Justice

The DiDomenicos have been charged with violating on numerous dates sections 400, 404, 405 (G10), 1200 and 1202 of Ordinance no. 26, the 1975 Zoning Ordinance of Milford Township. These sections prohibit the operation of a junkyard in an RP (Resource Protection) district and provide for fines and penalties for violations of the ordinance. The DiDomenicos have also been charged with operating a junkyard without a license in violation of Ordinance no. 6, the Junk Yard Ordinance. In their defense, the DiDomenicos allege that they had a valid nonconforming use to operate a junkyard on their property and that they were unlawfully and improperly refused a junkyard license. If they had a valid nonconforming use, the zoning ordinance would not apply to their property and consequently, there could have been no violations.

The policy of the law with regard to nonconforming uses is clear. The right to the continuation of a nonconforming use is of constitutional dimension. However, it will be strictly construed in order to comply with the basic purpose of a zoning ordinance, the orderly development of a community:

Township of Kelly v. Zoning Hearing Board of Kelly Township, 36 Pa. Commonwealth Ct. 509, 388 A. 2d 347 (1978); Ringtown Enterprises, Inc. and Circle City Rentals, Inc. v. Borough of Ringtown, 34 Pa. Commonwealth Ct. 349, 383 A. 2d 1292(1978); Hauser v. Borough of Catasauqua Zoning Hearing Board, 20 Pa. Commonwealth Ct. 313, 341 A. 2d 566 (1975). As the Pennsylvania Supreme Court stated in Hannà v. Board of Adjustment, 408 Pa. 306, 312, 183 A. 2d 539, 543 (1962):

"The continuance of nonconforming uses under zoning ordinances is countenanced because it avoids the imposition of a hardship upon the property owner and because the refusal of the continuance of a nonconforming use would be of doubtful constitutionality. Even though zoning ordinances permit the continuance of nonconforming uses, it is the policy of the law to closely restrict such nonconforming uses and to strictly construe provisions in zoning ordinances which provide for the continuance of nonconforming uses."

Section 702 of Milford Township Ordinance no. 26, the Zoning Ordinance of 1975, provides for the continuation of a nonconforming use which is defined by section 700(a) to be "a use . . ., which does not comply with . . . a zoning ordinance . . ., where such use was lawfully in existence prior to the enactment of such ordinance . . ." Pursuant to the above ordinance, the elements of proof necessary to establish a valid nonconforming use are: (1) that it was an actual use, (2) that it existed, (3) prior to the enactment of a zoning ordinance and (4) that it was lawful: McGeehan v. Zoning Hearing Board of Springfield Township, 45 Pa. Commonwealth Ct. 403, 407, 407 A. 2d 56 (1979).

"The burden of proving the extent or existence of a nonconforming use rests on the property owner who would claim the benefit of the rights accorded property with that status." Overstreet v. Zoning Hearing Board of Schuylkill Township, 49 Pa. Commonwealth Ct. 397, 402, 412 A. 2d 169, 171, 172 (1980); Little v. Zoning Hearing Board of Abington Township, 24 Pa. Commonwealth Ct. 490, 357 A. 2d 266 (1976); Lower Southampton Township v. Karpinski, 13 Bucks 570 (1964). Buckingham Township v. Scheets, 13 Bucks 557 (1964). In 1980, the Commonwealth Court also added that the required proof must be by objective evidence: Overstreet.

Since the DiDomenicos' operation did not conform to the prior zoning ordinance, they must establish by objective evidence that they had a valid nonconforming use before its enactment in June, 1969.

There is no doubt that their junkyard business is a use and that it was actually in existence. At issue, however, is whether it existed *prior* to the 1969 Zoning Ordinance and whether it was *lawful* at that time.

Section 226 of the 1975 Zoning Ordinance defines a junkyard as "an area of land . . . used for the storage outside . . . of a . . . building, of used or discarded materials," and deems the "deposit or storage of two or more motor vehicles not having valid inspection stickers, or two or more wrecked or broken vehicles, or the major parts of two or more such vehicles . . ." to be a junkyard. The evidence presented at the hearing was confusing and conflicting. The township's witness, Rosanna Kern, testified that there was no junk, other than a car, an old freezer and a Coke machine, on the property

before 1976, but another of its witnesses, Florence Warris, testified that in 1968 there were four or five and perhaps as many as ten automobiles there without licenses. Henry Klausfelder, Junk Yard Inspector from 1961 to 1971, stated that he visited the DiDomenicos' property in May or June of 1968 where he saw drums of battery acid lead and two cars for which he cited the owners under the Junk Yard Ordinance. Also introduced into evidence was a letter dated December 8, 1969 from Mr. Klausfelder to the DiDomenicos' previous attorney saying that Nicholas DiDomenico "did indeed, store some junked cars on this property prior to the passage of our Zoning Ordinance."

In support of their position, the DiDomenicos presented evidence that they began using their Milford property with the prior owner's permission, as a junkyard in April, 1968, even before they obtained title. In addition to the testimony of Nicholas and Louis, their friend and customer Douglas McLean testified that between the spring of 1968 and 1978 he visited the property approximately twice monthly to buy and sell cars and parts and that he always saw junked cars and radiators there. They also introduced into evidence the testimony, taken before the district justice, of Charles Powell, now deceased, who worked part-time for the DiDomenicos on their Milford property in 1968. He especially remembered being there in July, 1968 when he was on vacation from his full-time job. He described the work he did to include salvaging lead from battery acid and dismantling cars. He testified that there were on the property in 1968 cars, drums of battery acid, trash, and wire; that some of the battery acid leaked onto a neighbor's property killing the grass; and that he had seen Mr. Klaus-

felder there in 1968. Also introduced into evidence were a number of bills for trash, flux (battery acid), skids, lead scrap, auto radiators, batteries, etc. dated each year from 1968 through 1975.

In a case like this where neighbors opposed to the operation of a junkyard next door are testifying for one side and the owners and operators of the business who have a financial stake in the outcome are testifying on the other, there is a potential credibility problem. See DiNardo v. City of Pittsburgh, 15 Pa. Commonwealth Ct. 279, 325 A. 2d 654 (1974). Here, the weight given to the neighbors' testimony is tempered by their obvious hostility to the junkyard. Likewise, the credibility of the DiDomenicos with regard to the bills and receipts for junk materials which they introduced is diminished. Some of the bills are addressed to "Nick DiDomenico" but quite a few are to "Bill Dido," the name used by his brother. Also, the addresses on the bills are primarily the DiDomenicos' home address, not that of the Milford property. The DiDomenicos testified that this occurred because Bill Dido, being an experienced and larger junkyard operator, could get a better price for scrap and salvage materials than they could. Also, they stated that they received no mail in Milford but had it all sent to their home address in Rahns. Nevertheless, we have given more weight to the 1969 letter by Henry Klausfelder admitting that "indeed some cars" were on the property in 1968 and his testimony that the DiDomenicos were violating the Junk Yard Ordinance in May or June of 1968. We also find reliable the evidence given by Charles Powell, who at the time he testified before the district justice was retired, living out of state and no longer connected with the DiDomenicos.

Despite problems of credibility, we conclude the testimony of Mr. Klausfelder concerning his citing of the DiDomenicos in 1968, his letter of December 8, 1969, admitting the presence of cars on the property, the testimony of Florence Warris who saw cars there in 1968, and the statements of Charles Powell to be sufficient evidence to establish the existence of a junkyard on the property prior to the enactment of the 1969 zoning ordinance. We hold that the DiDomenicos have met their burden of proof, particularly since, under section 226 of the 1975 Zoning Ordinance, they need only prove the storage of two or more unlicensed vehicles to establish the existence of a junkyard.

The final element which the DiDomenicos must prove in order to establish their junkyard as a nonconforming use is that it was "lawfully" in existence. The general rule as stated by the Commonwealth Court in Hauser, 20 Pa. Commonwealth Ct. at 317, 341 A. 2d at 569, is that: "An existing illegal use cannot form the basis for the establishment of a valid nonconforming use." Based on this rule, it is without controversy that a use established in violation of an existing zoning ordinance is unlawful: Com. v. Cieslak, 179 Pa. Superior Ct. 441, 115 A. 2d 418 (1955).

At the time that the DiDomenicos established their junkyard, there was no zoning ordinance in effect. However, all parties agree that the use was in violation of the 1963 Junk Yard Ordinance because the owners had not obtained a junkyard license. Indeed, they were cited under the ordinance and subsequently convicted in 1969. The Junk Yard Ordinance is not a zoning ordinance, the purpose of which is to foster orderly development. Rather it is regulatory in nature, seeking to control

the *manner,* not the *type,* of activity that is carried on in a particular location.

The law is far from clear as to whether a use in violation of a regulatory ordinance is not "lawful" as contemplated in the definition of a nonconforming use. In fact, as stated in 6 Rohan, Zoning And Land Use Controls at 41-33: "The courts are closely divided on the question of whether a failure to obtain a required permit which could have been lawfully issued is alone sufficient to preclude a status of valid nonconforming use."

Until recently there was little law in Pennsylvania directly on point and the few trial court holdings that existed were forced to rely on out of state cases. See Papandrea v. McKeever, 73 Dauph. 51 (1958). In 1979, however, the Commonwealth Court announced two diametrically opposed decisions. In the first of these, Pushnik v. Hempfield Township, 43 Pa. Commonwealth Ct. 332, 402 A. 2d 318 (1979), decided in June 1979, junkyard owners were appealing a court order to clean up their property and to remove all junk, debris, etc. From 1964 through 1966 they had operated a licensed junkyard. By 1969, however, they were no longer licensed and were carrying on a septic tank, excavating, sewer and water line business. In 1970 the township passed a zoning ordinance which deemed the presence of one or more unlicensed and inoperable cars to be a junkyard and which prohibited that use on the appellants' property. Appellants then applied for, and were denied, a junkyard license. On appeal they argued that they were entitled to a license for a junkyard as a valid nonconforming use. The court held at 43 Pa. Commonwealth Ct. 335, 402 A. 2d 320:

"This argument must fall for either of two rea-

sons. First, since 1966 the property has not been licensed as a junkyard and therefore any nonconforming use in effect at the time these zoning regulations were passed in 1970 was illegal and could not qualify as a nonconforming use. Commonwealth v. Cieslak, 179 Pa. Super. 441, 115 A. 2d 418 (1955). At most, it could have been an illegal accessory use, and accessory uses do not ripen into nonconforming uses."

The second case, McGeehan v. Zoning Hearing Board of Springfield Township, 45 Pa. Commonwealth Ct. 403, 407 A. 2d 56 (1979), was decided in September 1979. There, neighboring property owners were challenging an order by the Bucks County Court of Common Pleas permitting the owners of a nonconforming junkyard to expand their use. The junkyard owners had been storing used and discarded vehicles, parts, refrigerators, etc. on their 13 acre property since 1961. In 1971 the township enacted its first zoning ordinance which placed the property partly in a RP (Resource Protection) district and partly in a RR (Rural Residential) district, neither of which permitted the establishment of a junkyard. The definition of a junkyard in the local zoning ordinance was virtually identical to that in the case at bar. The ordinance also contained the same requirement that the zoning officer list all nonconforming uses, section 701, and the same definition of a nonconforming use, section 700.

On appeal the neighbors contended that the owners' failure to introduce evidence of their being licensed for 1971 and 1972 pursuant to a junkyard ordinance requiring annual junkyard licenses rendered their use illegal at the time of the zoning ordinance's enactment. When viewing the evi-

dence in the light most favorable to the owners, the Commonwealth Court found that the junkyard was not licensed for several months in 1971 during which time the zoning ordinance was passed. However, it had been licensed for several years before and after 1971. In disposing of this argument and in affirming the lower court's order, the Commonwealth Court held at 45 Pa. Commonwealth Ct. 408, 407 A. 2d 59:

"However, even accepting Appellants' evidentiary argument, we disagree that this lapse in proper licensing in conformity with Ordinance 10 is dispositive of the use's status so long as the use of the premises as a junkyard does not run afoul of a *zoning* restriction. Cf. Hauser v. Borough of Catasauqua Zoning Hearing Board, supra, and Commonwealth v. Cieslak, supra, wherein property owners were not permitted to assert nonconforming uses on the basis of uses that were illegal under pertinent zoning regulations. We thus conclude that the Grants' junkyard is a lawful land use that predates the premises' RR and RD zoning classification and, hence, a nonconforming use." (Emphasis in original.)

After reading the above Commonwealth Court decisions, we are in a quandary. The only distinguishing characteristics are that in McGeehan the unlicensed period was short and *might* have been inadvertent (although this was not mentioned by the court), whereas in Pushnik it had existed for a year or more. Also, in McGeehan the township had listed the junkyard as a nonconforming use pursuant to section 701 of the zoning ordinance and the zoning hearing board had approved the requested expansion. On the other hand, in Pushnik

the township was seeking to enforce its zoning ordinance by requiring the junkyard to be cleaned up. Also, in Pushnik the junkyard was not the primary use of the property for a period of time before enactment of the zoning ordinance, while in McGeehan it was. Nevertheless, the facts of both cases are quite similar and the legal issues are identical.

In the case at hand, we are inclined to follow McGeehan and find the DiDomenicos' use lawful despite its violation of the Junk Yard Ordinance. It is the later decision and it explicitly recognized the difference between a regulatory and a zoning ordinance. In addition, there is evidence here that the DiDomenicos made a timely application for a junkyard license and were improperly refused. If the township refused them a license which it should legally have issued, we should not now let it assert the lack of a license to defeat the establishment of a valid nonconforming use. Accordingly, we hold that, under the definition of a nonconforming use in section 700(a) of the 1975 Zoning Ordinance, the DiDomenicos have established a use which was lawfully in existence prior to the enactment of the 1969 Zoning Ordinance.

The next step in our inquiry is to determine whether the nonconforming use was abandoned as the township claims. The rule with regard to abandonment of a nonconforming use is that the burden of proof is on those asserting abandonment to show the intention to abandon which is to be assumed from overt acts or failure to act and from statements and circumstances: Haller Baking Company's Appeal, 295 Pa. 257, 145 Atl. 77 (1928); DiNardo v. City of Pittsburgh, supra. The Commonwealth Court, in Grace Building Co., Inc., v.

Zoning Hearing Board of City of Allentown, 38 Pa. Commonwealth Ct. 193, 197, 392 A. 2d 892, 894 (1978), noted that:

"[W]here an ordinance places a time limitation on the right to resume a nonconforming use, the intention to surrender the right may be presumed from the expiration of the designated period, but it is still necessary to show the concurrent overt acts or failure to act which indicate abandonment. . . . Moreover, although the law also encourages compliance with the applicable zoning ordinance . . . it is clear that a property owner has a constitutional right to continue a nonconforming use until the municipality proves its abandonment."

Section 706 of Milford's 1975 Zoning Ordinance provides that "if a nonconforming use . . . is abandoned for a continuous period of one (1) year" any subsequent use must comply with the ordinance. The township has attempted to show that the Di-Domenicos discontinued their operation of a junkyard either in the spring of 1969 after they were cited for violating the Junk Yard Ordinance or in 1974 when they cleaned up the property for sale. Mrs. Warris testified that from May, 1969 until 1974 two junked cars remained on the property but were then removed and that from 1974 until 1976 no junk was present. However, in her previous testimony before the district justice she had said that two cars remained until 1976. Another neighbor, Ronald Lecky, testified that he saw nothing "nonnatural" on the property before 1976 but he admitted that the brush was waist high making visibility difficult. Rosanna Kern testified that there were present on the property a car, an old freezer, and a Coke machine prior to 1976.

On the other hand, the DiDomenicos presented the testimony of two customers, the prior testimony of their part-time employe, as well as their own statement to the effect that the property was indeed cleaned up in both 1968 and in 1974 but that at no time was all the junk removed and at no time did the business cease to operate. They do say that the nature of their operation is seasonal, busier at some times than at others. They also state that in 1976 they excavated a portion of the rear of the property and increased the amount of scrap and salvage materials stored there. Also, all witnesses agreed that, prior to 1976 when the property was excavated, there were high brush and weeds over the front portion and the rear was covered with large boulders and trees. Consequently, the nature of the landscape itself would make the junk stored there less visible prior to 1976 than thereafter.

When viewed in light of the rule reiterated in Grace Building Company, Milford Township has not sustained its burden of proving abandonment. The only overt act from which to presume intent to abandon are the two instances when the DiDominicos cleaned up their property. This is not sufficient proof of their intention to surrender their established right to a nonconforming use. Therefore, we hold that the DiDomenicos did not abandon their right to operate a junkyard.

Since we have determined that the DiDomenicos had a valid nonconforming use which was not abandoned, they cannot be found in violation of the Zoning Ordinance. By the ordinance's own provision in section 702, a pre-existing lawful use may be continued, although it does not conform to other requirements of the ordinance. For this reason, we hold that the allegations against the DiDomenicos

as to violations of the 1975 zoning ordinance are dismissed.

In addition to charges of violating the zoning ordinance, the DiDomenicos are also alleged to have violated ordinance no 6, the Junk Yard Ordinance. Specifically, the township claims that on certain dates in September and October, 1976 the DiDomenicos operated a junkyard on their property without first obtaining a license. We have previously found that their operation of a junkyard was continuous from 1968 to 1976 and that during that period they did not have a junkyard license. We now find that their operation of a junkyard on the Milford Township property was continuous to the time of the hearing and that they have never obtained a proper license.

Nicholas DiDomenico, himself, testified that he had been operating a junkyard since 1968 to the time of the hearing. Louis DiDomenico testified that some of the cars brought onto the property in 1975 were still there in 1978, that they planned to reconstruct the barn and that they have a junk certificate from the state to operate a junkyard. They both also testified that at no time since 1976 had they obtained a junkyard license. Furthermore, we note that the DiDomenicos are currently suing in mandamus for the issuance of a junkyard license. Therefore, the conclusion is inescapable that they did in fact operate a junkyard without a license in September and October of 1976.

By way of defense, the DiDomenicos claim that they were illegally refused the necessary license. On this point, we agree. However, we also find that until the cases at bar were instituted they never challenged this refusal. Instead they continued to operate and in reality were quietly defying the ordinance.

The testimony of Clarence Huber and Henry Klausfelder, the present and prior junkyard inspectors, is conflicting as to the procedure for applying for a junkyard license. Mr. Huber stated that no application forms existed but that an application could be made orally or by letter. Mr. Klausfelder said that forms existed but he did not know where they were. The DiDomenicos testified as to making two oral applications and one by letter in December, 1969. Each time they were thwarted. Nevertheless, at no time did they lodge a formal objection and it was not until 1977 that they made a written application for a license. Furthermore, they continued to operate for seven years without a license until the protests of neighbors sparked the initiation of the current proceedings.

It is a general rule that when a permit or license, which is required by law, is wrongfully refused, that refusal does not justify the applicant's taking the law into his own hands by operating without it. His remedy is to compel the issuance of the necessary permit or license: Poulos v. New Hampshire, 345 U.S. 395 (1953), reh. denied, 345 U.S. 978 (1953); Anno., Right of person wrongfully refused license to act, 30 A.L.R. 2d 1006 (1953); 9 McQuillin, Municipal Corporations §26.79 (3d ed.). Therefore, we conclude that although the DiDomenicos were improperly denied a junkyard license, they cannot assert the refusal as a valid defense to their violation of ordinance no. 6. We find them guilty of violating the junk yard ordinance on the dates charged.

Section 8 of the Junk Yard Ordinance provides for "a fine not exceeding $300 plus costs of prosecution" for each day's violation. We see no reason to disturb the fine of $1000 and costs imposed for violation of the junk yard ordinance by the district

justice. Therefore, we hold that a fine in the amount of $1000 and costs is imposed against the DiDomenicos.

## MANDAMUS

Nicholas and Margaret DiDomenico are suing in mandamus to require that Clarence Huber, the Junk Yard Inspector, and the Board of Supervisors of Milford Township issue them a junkyard license for their Milford property.

An action in mandamus seeks to compel a public official to perform an act which he is obliged to perform and which is not discretionary, but rather is purely ministerial, where the plaintiff has a clear legal right to the relief requested and there is no other adequate remedy. This well settled rule is stated by the Pennsylvania Supreme Court in Unger v. Hampton Township, 437 Pa. 399, 401, 263 A. 2d 385, 387 (1970): "'Mandamus is an extraordinary writ which lies to compel the performance of a ministerial act or mandatory duty where there is a *clear* legal right in the plaintiff, a corresponding duty in the defendant, and a want of any other appropriate and adequate remedy.' Boslover A.A.B. Ass'n. v. Philadelphia Authority, 425 Pa. 535, 538, 229 A. 2d 906 (1967); Travis v. Teter, 370 Pa. 326, 330, 87 A. 2d 177 (1952)." (Emphasis in original.)

According to section 2 of the Junk Yard Ordinance the issuance of a license is mandatory after a proper application and fee have been received by the township. After describing the requirements for an application, the ordinance provides:

"Upon receipt of the application and license fee of $100.00 by the Township, if the applicant complies with the provisions hereof, the Secretary of the

Board, or the Board, shall within ten days issue its license authorizing the operation and maintenance of a junk yard upon the premises by the applicant."

Where, as here, performance is mandatory and proper application has been made, the issuance of a permit is a mere ministerial act which admits of no discretion by the Township: Baldwin Borough v. Matthews, 394 Pa. 53, 145 A. 2d 698 (1958). Furthermore, where plaintiffs have done all that is required of them, a refusal to issue a permit is arbitrary and capricious: Doyle v. Springfield Township, 394 Pa. 49, 145 A. 2d 695 (1958).

In June, 1977 the DiDomenicos applied for a license pursuant to ordinance no. 6. On June 28, 1977 the township refused their request stating as its reason that a junkyard is not a permitted use under the zoning ordinance. We have previously determined that the DiDomenicos' junkyard is exempted from the provision of the zoning ordinance because it is a valid nonconforming use. Therefore, the township's refusal of a license was arbitrary and capricious and it is under a duty to issue one.

In order for the DiDomenicos to prevail in mandamus, they must also show a clear legal right to a license and the lack of any other appropriate and adequate remedy. In light of our foregoing conclusions with regard to the DiDomenicos' right to operate their junkyard as a valid nonconforming use, it is certain that they have a clear legal right. Additionally, the township has not disputed that there are no other procedures available whereby they may obtain a junkyard license. Accordingly, the DiDomenicos have established that mandamus is the appropriate remedy in this case.

At the moment, the DiDomenicos are not in compliance with section 4 of the Junk Yard Ordinance

which would require expensive improvements to their property. For obvious reasons, they have not made these improvements pending a determination of their right to a valid nonconforming use. They have, however, expressed to the court their willingness to comply with all aspects of the ordinance. Therefore, we hold that an action in mandamus will lie against Milford Township's Board of Supervisors and its Junk Yard Inspector and that they will be compelled to issue a junkyard license to the DiDomenicos. Nevertheless, no license shall be issued until the property is in compliance with section 4 of ordinance no. 6.

For the above reasons we make the following

## CONCLUSIONS OF LAW

1. Nicholas and Margaret DiDomenico have a right to continue their operation of a junkyard on their Milford Township property as a valid nonconforming use.

2. At no time since the establishment of their nonconforming use have they abandoned it.

3. They are not guilty of violating the 1975 Zoning Ordinance of Milford Township because they have a valid nonconforming use.

4. The DiDomenicos have violated section 2 of ordinance no. 6 of Milford Township in that they operated a junkyard in the township without a license during September and October, 1976.

5. The DiDomenicos are to be fined $10.00 and costs for violating the junk yard ordinance.

6. Mandamus is appropriate, in this case, to compel the issuance of a junkyard license pursuant to ordinance no. 6.

7. The junkyard license shall not be issued until the DiDomenicos' junkyard complies with section 4 of ordinance no. 6.

## ORDER

And now, February 27, 1981 it is hereby ordered and decreed that:

1. The complaint of Milford Township on appeal from a district justice judgment is dismissed as to the alleged violation by Nicholas, Margaret and Louis DiDomenico of the township's Zoning Ordinance and judgment is entered in favor of defendants.

2. Nicholas, Margaret and Louis DiDomenico are guilty of violating section 2 of Milford Township ordinance no. 6 and are ordered to pay a fine of $1000 and costs.

3. The Board of Supervisors of Milford Township and its Junk Yard Inspector are ordered to issue a junkyard license to Nicholas and Margaret DiDomenico upon their compliance with section 4 of ordinance no. 6.

Unless exceptions are filed within ten days after notice of the filing of this decision, the prothonotary shall, on praecipe, enter final judgment hereon.